IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ANITA GRANT, | ) | 4:08CV3250 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| HUGHES BROTHERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Anita Grant, claims that she was sexually harassed and subjected to a hostile work environment by a co-worker while employed by the defendant, Hughes Brothers, Inc.  Suit is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17.

Hughes Brothers has filed a motion for summary judgment, and argues that Grant cannot establish a prima facie case because the undisputed facts demonstrate that once Hughes Brothers learned of the alleged harassment, it took prompt and effective remedial action to end any further misconduct.  The court agrees.  Upon careful review of the pleadings (filings 1, 6), briefs (filings 24, 27, 29), and evidence (filings 25, 28, 30), the court finds and concludes, for the reasons discussed below, that there is no genuine dispute as to any material fact,[1] and that Hughes Brothers is entitled to judgment as a matter of law.  See Fed.R.Civ.P. 56(c)(2).

Pursuant to Nebraska Civil Rule 56.1(a)(1), Hughes Brothers has set forth in its brief a 36-paragraph statement of material facts it contends are not genuinely in

---

[1] A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Chial v. Sprint/United Management Co.*, 569 F.3d 850, 853 (8th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

dispute. In response, Grant has indicated her agreement to all but paragraphs 6 and 34, and has added comments to paragraphs 16 and 29. Hughes Brothers' statement and Grant's responses are set forth below:

    1. Hughes Brothers is located in Seward, Nebraska, and is engaged in the manufacturing of transmission and distribution materials and production of fiberglass rebar. (Exhibit 2 (filing 25-3): Affidavit of Chantel Denker ("Denker Aff."), ¶3). On average, Hughes Brothers employs 300 people. (Id.).

    2. Grant began working for Hughes Brothers on September 26, 2005. (Ex. 4 (filing 25-5): Grant Response to Request for Admission ("RFA") No.1). In March of 2007, Grant held the position of Helper in the Reclaim Department, first shift. (Denker Aff., ¶4). Grant was schedule[d] to return to work at Hughes Brothers on July 14, 2009, but left Denker a message on that date at 6:30 a.m. stating she quit. (Id.).

    3. Ron Truhlicka ("Truhlicka") began working for Hughes Brothers on November 11, 1991. (Denker Aff., ¶6). In 2007, Truhlicka held the position of Lumber Grader in the Boring Department, first shift. (Ex. 3 (filing 25-4): Affidavit of Ben Hughes ("Hughes Aff."), ¶ 15). Truhlicka has never held a supervisory or management position at Hughes Brothers. (Id.).

    4. Chantel E. Denker ("Denker") began working for Hughes Brothers on April 17, 2007, in the position of Human Resources Manager. (Denker Aff., ¶1). Prior to April 17, 2007, Ben F. Hughes ("Ben Hughes") was the Personnel Director for Hughes Brothers. (Hughes Aff., ¶1).

    5. On March 19, 2007, Grant came to Ben Hughes' office with her husband at approximately 6:55 a.m., and reported for the first time on that date that a co-worker, Truhlicka, had engaged in inappropriate conduct and remarks directed at Grant in the workplace. (Grant Response to RFA No.7; Ex. 1 (filing 25-2): Deposition of Anita Grant ("Grant Dep."), 53:7-54:16; Hughes Aff., ¶3). Grant described the

conduct and provided the names of possible witnesses. (Hughes Aff., ¶3; Grant Dep. at 56:23-57:2).

6. After receiving Grant's report, Ben Hughes promptly initiated an investigation; he and Hughes Brothers' President, John Hughes, met on March 19, 2007, with Grant's supervisor, Dan Kotil ("Kotil"). (Hughes Aff., ¶4). Kotil has worked for Hughes Brothers for 40 years. (Exhibit 5 (filing 25-6): Deposition of Dan Kotil ("Kotil Dep."), 5:5-7). Kotil reported to Ben Hughes and John Hughes that he had not witnessed or observed any inappropriate conduct between Truhlicka and Grant, but that he had heard some gossip involving the two of them. (Hughes Aff., ¶4; Ex. A to Hughes Aff.).

> Grant's response: Although Ben Hughes states in an affidavit that he met with Grant's supervisor, Dan Kotil on March 19, 2007 (Hughes Aff., ¶4), in his deposition, Kotil testified that he was not sure if he heard about the Plaintiff's complaint from John Hughes and that he did not think he got any details what was in the complaint. [Exhibit 7 (filing 28): Complete Deposition of Dan Kotil ("Kotil Dep."), 7:6-22]. Furthermore, Kotil testified he didn't remember being involved directly in any investigation and didn't know if any witnesses were interviewed. (Kotil Dep., 8:4-19). Kotil was never aware that Plaintiff's complaints against Ron Truhlicka had merit. (Kotil Dep., 20:7-13).[2]

7. Kotil had observed both Grant and Truhlicka visiting with one another on occasion at either Truhlicka's work station or Grant's work station. (Kotil Dep. at 19:7-15). The work stations are approximately 50 feet apart and are separated by an aisle used for forklift and other traffic. (Exhibit 6 (filing 25-7): Deposition of Ron Truhlicka ("Truhlicka Dep."), at 24: 17-25).

---

[2] Failure to remember and lack of knowledge are not sufficient to create a genuine dispute. *Federal Election Com'n. v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002). Consequently, Grant's responsive statement concerning Kotil's deposition testimony is immaterial. Paragraph 6 of Hughes Brothers' statement of material facts will be treated as established.

3

8. Grant never complained to Kotil about Truhlicka's behavior. (Kotil Dep. at 19:16-22; Hughes Aff., ¶4). Nor did Grant ever ask Kotil to intervene on her behalf to end any conduct on the part of Truhlicka. (Hughes Aff., ¶4).

9. Also on March 19, 2007, Ben Hughes and John Hughes met with and interviewed three of the witnesses Grant had identified: Brian Schwietzer, Shelley Watson, and Mick Shephard. (Hughes Aff., ¶5; Ex. A to Hughes Aff.; Grant Dep. at 58: 13-59:7). Grant agrees this was an appropriate step. (Grant Dep. at 59: 15-19).

10. Following the witness interviews, Ben Hughes and John Hughes met again with Grant on March 19, 2007, at approximately 12:20 p.m. (Hughes Aff., ¶5; Ex. A to Hughes Aff.). Ben Hughes and John Hughes explained to Grant that although none of the witnesses interviewed had personally observed or overheard the conduct Grant had reported, Ben Hughes and John Hughes believed her report had merit. (Hughes Aff., ¶6; Grant Dep. at 62: 13-25).

11. Ben Hughes told Grant that the company considered the reported comments and conduct by Truhlicka to be unacceptable, that it was not "shoptalk" and Grant did not have to put up with it, and that if Grant had any further problems with Truhlicka, she should let Ben Hughes or John Hughes know. (Grant Dep. at 63:1-15; Grant Response to RFA No. 10; Ex. A to Hughes Aff.).

12. Ben Hughes and John Hughes assured Grant on March 19, 2007, that the Company prohibited inappropriate conduct in the workplace, that she was entitled to a harassment-free workplace, and that they would take corrective action with Truhlicka to end the conduct. (Hughes Aff., ¶6). Grant was satisfied with the company's response at that time. (Grant Dep. at 63:16-18).

13. On March 20, 2007, Ben Hughes and John Hughes met with Truhlicka at approximately 7:30 a.m. (Hughes Aff., ¶7). Ben Hughes explained the report made against him by Grant. (Id.). Truhlicka

4

requested that a representative of the Union be present with him for the remainder of the meeting, and a representative was summoned. (Id.).

14. Truhlicka was given a disciplinary write-up advising him that sexual harassment is both unlawful and violates Hughes Brothers' policy as set forth in both the collective bargaining agreement and the Employee Handbook. (Hughes Aff., ¶7; Grant Response to RFA No.9; Grant Dep. at 60:22-61:22). The disciplinary write-up advised Truhlicka that he was to stop any unwelcome sexual advances toward Grant and that he was not to engage in any conversations of a sexual nature with any female co-workers. (Hughes Aff., ¶8; Ex. B to Hughes Aff.).

15. Truhlicka was also advised on March 20, 2007, that if he failed to abide by the instructions in the write-up, or if he retaliated against Grant in any way, his employment would be terminated. (Hughes Aff., ¶9; Ex. B to Hughes Aff.).

16. During the meeting on March 20, 2007, Truhlicka listened, occasionally nodded his head, and said very little. (Hughes Aff., ¶10). Truhlicka neither denied nor admitted the conduct alleged by Grant. (Id.).

> Grant's response: Agree, without any actual knowledge of what was admitted to in his March 20, 2007 meeting, however in his deposition, Truhlicka admitted the truth of a number of the offending words or actions set out in Exhibit 8 to Grant's Deposition, identified in Truhlicka's Deposition as being on page 16, but which is hand-numbered at page 19. [Exhibit 8 (filing 28): Complete Deposition of Ron Truhlicka (Truhlicka Dep."), 8:6-25; 9:1-25; 10:1-17; 24:9-11)].[3]

---

[3] Hughes Brothers states that it "does not dispute Truhlicka's deposition testimony in which he admitted making some of the comments attributed to him by Grant[,]" but that "if this case goes to trial there will be a dispute as to whether Truhlicka's comments were unwelcome or subjectively offensive to Grant. But for purposes of its summary judgment motion only, Hughes Brothers presumes this to be the case." (Defendant's reply brief (filing 29), at 2.)

17. Grant agrees that the write-up and disciplinary warnings that were given to Truhlicka on March 20, 2007 were appropriate, that the action taken was an adequate response by Hughes Brothers to the report she had made to Ben Hughes, and that she had no complaint about Hughes Brothers' actions at that time. (Grant Dep. at 61:23-62: 12, 64: 17-66: 13, 101:8-25).

18. Both prior to and following Grant's report on March 19, 2007, Hughes Brothers never received any other complaints regarding Truhlicka from any other employee. (Hughes Aff., ¶¶11-12; Denker Aff., ¶5).

19. On Friday, May 4, 2007, Grant left Ben Hughes a note, stating that she wanted to see him. (Grant Response to RFA No. 12; Grant Dep. at 71:20-72:1). Ben Hughes gave this note to Denker, who was then the Human Resources Manager, so that Denker could determine if Grant's request to see Ben concerned a human resources matter. (Hughes Aff., ¶13). Ben Hughes had no other contact or communication with Grant regarding her report of inappropriate conduct. (Hughes Aff., ¶¶13-14).

20. After Ben Hughes delivered Grant's note to Denker, Denker located Grant in the workplace on the same day, May 4, 2007. (Grant Response to RFA No. 13; Grant Dep. at 76:2-12). Grant told Denker that her request to see Ben was for a non-HR related issue. (Denker Aff., ¶8; Grant Response to RFA No. 14; Grant Dep. at 77:23-78:7, 79:7-20).

21. On Monday, May 7, 2007, John Hughes received a phone call from Grant stating she had a situation and could not get a hold of Ben and that she got "treated like shit in the workplace." (Denker Aff., ¶9). Grant told John Hughes that she was dissatisfied with co-worker Mick Shepard ("Shepard") and believed he was talking with other employees about her harassment complaint. (Id.; Grant Response to RFA No. 15; Grant Dep. at 79:25-80:22, 81: 12-25).

22. On May 8, John Hughes, Denker, and Kotil met with Grant regarding the concerns she had expressed to John Hughes the previous

6

day. (Grant Response to RFA No. 16; Grant Dep. at 82:1-25; Denker Aff., ¶10).

23. On May 9, 2007, Denker and John Hughes met with Shepard and Truhlicka. (Denker ¶11; Grant Response to RFA No. 17; Grant Dep. at 83: 13-84:6). Both Shepard and Truhlicka denied that they had been discussing Grant's allegations with others. (Denker Aff., ¶ 11). Both Shepard and Truhlicka were asked to and did sign confidentiality reminders on May 9, 2007. (Id.; Exs. C and D to Denker Aff.; Grant Responses to RFA Nos. 18 and No. 19; Grant Dep. at 84:2587: 4). Both Shepard and Truhlicka were told by Denker not to discuss the matter with anyone or disciplinary action would follow, up to and including termination of employment. (Denker Aff., ¶11; Grant Dep. at 85:20-25, 86: 15-18).

24. Again, Grant was satisfied with the company's response to the concerns she had expressed to John Hughes on May 7, 2007, and felt that the company's response was appropriate. (Grant Dep. at 87:14-16, 102:1-21).

25. Denker instructed Grant that, if Grant had any continued issues, she should inform Denker or someone else in management. (Denker Aff., ¶12; Grant Dep. at 88:5-9).

26. On June 15, 2007, Kotil called Denker stating that Grant was in his office with some questions that he was not able to answer. (Denker Aff., ¶13). Denker asked Kotil to send Grant to Denker's office. (Id.). Grant reported to Denker that she felt some employees were pointing and staring at her. (Id.; Grant Response to RFA No. 22; Grant Dep. at 95: 16-96: 17).

27. Denker advised Grant on June 15, 2007, that Grant could approach another employee and try to resolve with that employee any issues of perceived staring or pointing. (Denker Aff., ¶14; Grant Response to RFA No. 23; Grant Dep. at 96: 18-97:11). Denker also advised Grant to document any further incidents and to let Denker know

7

if Grant needed any further assistance from Denker. (Denker Aff., ¶14; Grant Response to RFA No. 23; Grant Dep. at 97: 1-11).

28. Again, Grant agrees that the company's response to the concerns she had expressed on June 15, 2007, was sufficient. (Grant Dep. at 97:15-20).

29. After June 15, 2007, Grant never brought forth or communicated any additional concerns regarding harassment or confidentiality to Denker, Kotil, John Hughes, or anyone else in a management position at Hughes Brothers. (Denker Aff., ¶15).

> Grant's response: Agree, but add that on the previous day, June 14, 2007, Plaintiff complained to Denker that her supervisor, Dan Kotil, was treating Plaintiff different ever since she made her harassment complaint. [Exhibit 9 (filing 28):Complete Deposition of Anita Grant (Grant Dep."), Exhibit 8 attached thereto, page 8)].[4]

---

[4] Hughes Brothers objects that Grant's response is immaterial because she has not alleged a retaliation claim in her complaint. The court agrees that a claim of retaliatory conduct by a supervisor is separate and distinct from a claim of sexual harassment by a co-worker, which is all that Grant has alleged. "[R]etaliation claims are not reasonably related to underlying discrimination claims." *Wedow v. City of Kansas City*, 442 F.3d 661, 673 (8th Cir. 2006) (quoting *Duncan v. Delta Consol. Indus., Inc.,* 371 F.3d 1020, 1025 (8th Cir. 2004)). *But cf. Barrett v. Omaha Nat. Bank*, 726 F.2d 424, 428 (8th Cir. 1984) ("Implicit in the employer's duty to take corrective action, however, is the employee's right to complain of sexual harassment by a co-employee without fear of retaliation."). Grant has not requested leave to amend her complaint, nor is it apparent that she can show good cause for allowing an amendment at this time, *see Popoalii v. Correctional Medical Services*, 512 F.3d 488, 497 (8th Cir. 2008) ("If a party files for leave to amend outside of the court's scheduling order, the party must show cause to modify the schedule. Fed.R.Civ.P. 16(b)."), or that she exhausted her administrative remedies regarding a claim of retaliation, *see Wedow*, 442 F.3d at 674 (quoting *Duncan*, 371 F.3d at 1025) ("We do not require that subsequently-filed lawsuits mirror the administrative charges" as long as "the sweep of any subsequent judicial complaint" is no broader than "the scope of

30. Grant acknowledges that the alleged staring and pointing which she felt was directed at her "died off" over time or faded out. (Grant Dep. at 71:17-19, 90:18-22).

31. Following Grant's report on March 19, 2007, the inappropriate conduct about which Grant had complained never recurred. (Grant Dep. at 100:721; Truhlicka Dep. at 26:9-27: 13). Neither Grant nor any other employee ever reported any further conduct by Truhlicka of a sexual or inappropriate nature. (Hughes Aff., ¶12; Denker Aff., ¶15).

32. At all material times, including in 2006 and 2007, Hughes Brothers maintained, and continues to maintain, a policy prohibiting harassment in the workplace. (Denker Aff., ¶7). The policy is set forth in both the Employee Handbook and the collective bargaining agreement. (Grant Responses to RFA Nos. 2 and 3; Grant Dep. at 25:2-26: 18, 27: 15-29: 1; Exs. A and B to Denker Aff.). Grant acknowledges receiving them. (Grant Dep. at 26:22-27: 14).

33. Hughes Brothers' written policies prohibit harassment on the basis of sex in the workplace and set forth the procedure for reporting harassing conduct. (Grant Responses to RFA Nos. 5 and 6; Denker Aff., ¶7).

---

the EEOC investigation which could reasonably be expected to grow out of the charge" filed in the EEOC complaint.). In any event, Grant only complains in a journal entry that "I feel like my supervisor has been singling me out ever since he had to be in the office with me. He's been treating me differently since then– giving me harder jobs, not treating me the same as others, etc." (Filing 28, at 140.) "[R]etaliatory actions must be material, producing significant rather than trivial harm." *Devin v. Schwan's Home Service, Inc.*, 491 F.3d 778, 786 (8th Cir. 2007). "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not satisfy the [adverse employment action] prong." *Id.*, at 789 (quoting *Higgins v. Gonzales*, 481 F.3d 578, 584 (8th Cir. 2007)).

9

34. The only thing Grant alleges Hughes Brothers should have done differently is to have told witnesses at the start of the investigation of her report on March 19, 2007, that the witnesses should not talk about her report. (Grant Dep. at 104:4-12, 107: 1-110: 11).

Grant's response: Grant alleges that Hughes Brothers should have told witness at the start of the investigation of her report on March 19, 2007, that the witnesses should not talk about her report. (Grant Dep. 104:4-12). She also believes that Truhlicka should have been further disciplined for not completely terminating his offending behavior of staring at her by terminating him or suspending him. (Grant Dep. at 107:1-24).

35. Grant never pursued the process of filing a grievance through the Union regarding either her report of harassment or her confidentiality concerns. (Grant Dep. at 99: 1-21).

36. Following a determination by the Nebraska Equal Opportunity Commission adverse to Grant (Filing No.6: Answer of Hughes Brothers, ¶3), Grant filed this lawsuit alleging a claim of sexual harassment (Filing No.1: Grant Complaint, ¶7).

(Defendant's brief in support of motion for summary judgment (filing 24), at 3-10 (footnotes omitted; hyperlinks added); plaintiff's brief in opposition to motion for summary judgment (filing 27), at 2-5 (hyperlinks added).)

"To establish a prima facie hostile work environment claim, a plaintiff must prove: (1) that she was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 531-32 (8th Cir. 2008) (quoting *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir.2007)). "In determining

10

whether the employer failed to take 'prompt and effective remedial action to end the harassment,' [this court] consider[s] 'the amount of time between notice of the harassment and any remedial action, the options available to the employer such as employee training sessions and disciplinary action taken against the harassers, and whether or not the measures ended the harassment.'" *Jenkins v. Winter*, 540 F.3d 742, 749 (8th Cir. 2008) (quoting *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006), *cert. denied*, 550 U.S. 904 (2007)). "To show that a hostile work environment has continued after an employer's remedial action, a plaintiff need not prove an entire accumulation of harassing acts, amounting to a new and free-standing hostile work environment." *Engel v. Rapid City School Dist.*, 506 F.3d 1118, 1124 (8th Cir. 2007). *But see Rheineck v. Hutchinson Technology, Inc.*, 261 F.3d 751, 756-57 (8th Cir. 2001) (finding that plaintiff failed to create genuine issue of material fact on whether rumors that circulated in plant following defendant's remedial action were sufficient to create hostile work environment).

For purposes of its motion for summary judgment, Hughes Brothers does not contest Grant's ability to prove the first four elements of her prima facie case. It only contends that "[t]he undisputed facts in this case demonstrate that Hughes Brothers (a) neither knew nor should have known about the alleged harassment prior to Grant's report on March 19, 2007, and (b) took prompt and effective remedial action as soon as Grant made her report." (Defendant's brief, at 13.) Grant "concedes that the company was not put on official notice of the harassment leveled at [her] by Truhlicka until March 19, 2007[,]" and that Hughes Brothers "did act promptly to investigate the complaint, starting an investigation the same day [Grant] complained to Ben Hughes[,]" (Plaintiff's brief, at 6), but denies that the remedial action taken by Hughes Brothers was effective. Even though Grant testified at her deposition "that the write-up and disciplinary warnings that were given to Truhlicka on March 20, 2007 were appropriate, that the action taken was an adequate response by Hughes Brothers to the report she had made to Ben Hughes, and that she had no complaint about Hughes Brothers' actions at that time" (Defendant's statement of material facts,

11

¶ 17); that she "was satisfied with the company's response to the concerns she had expressed to John Hughes on May 7, 2007 [about Mick Shepard talking to other employees about her harassment complaint], and felt that the company's response was appropriate" (*Id.*, ¶ 25); and that "the company's response to the concerns she had expressed on June 15, 2007 [to Denker about some employees pointing and staring at her], was sufficient" (*Id.*, ¶ 28), she now argues that Hughes Brothers should have done more. She states:

> The memo summarizing Ben Hughes' investigation of Plaintiff's harassment complaint, Exhibit A to the Hughes Affidavit (Defendant's Exhibit 3), does not show that Truhlicka's supervisor was ever interviewed or made a part of management's response. This is corroborated by Defendant's Answers to Plaintiff's Discovery Requests answer to Interrogatory No. 4, which was Exhibit 9, made a part of Truhlicka Deposition.[5] Furthermore, even though Plaintiff's immediate supervisor, Dan Kotil, was made aware of Plaintiff's harassment as part of the investigation, there is no evidence that he was ever instructed to take any positive actions to insure Truhlicka's and Mick Shepard's compliance with the written admonishments to cease the objectionable remarks and activities and/or not speak of the matter. In fact he testified that he was never given any instructions by Denker, Ben Hughes or John Hughes on how he should act in regards to the allegations that had been made. (Kotil Dep., 9: 21-25, 10:1-8).

---

[5] Interrogatory No. 4 required Hughes Brothers to "list all employees who were contacted as part of Hughes Brothers['] investigation of Anita Grant's sexual harassment claim." (Filing 28, at 61.) Hughes Brothers answered that it contacted "Dan Kotil, Ron Truhlicka, Brian Schwietzer, Shelley Watson, and Mick Shepard." (*Id.*, at 62.) Grant indicated during her deposition that Truhlicka's supervisor was Denney Wullenwaber (*Id.*, at 81, 83), but this is disputed by Hughes Brothers. It has provided evidence that John Hughes, the company president, is also the supervisor of the Boring Department, and that Wullenwaber is a work leader and bargaining unit employee who reports to John Hughes. (Denker Supp. Aff. (filing 30-2), ¶7.) The court concludes that it is immaterial whether Wullenwaber supervised Truhlicka or whether he was ever contacted about Grant's complaint.

There is no evidence presented in the affidavits of Ben Hughes, or his successor, Chantel Denker, that Defendant ever took any action to make sure that the directives in the letter to Truhlicka dated March 20, 2007, were, in fact, obeyed. Nor is there any evidence that management ever took any positive steps to assure compliance with the "Confidentiality Reminder" letters to Truhlicka and Shepard.

Another example of how Defendant's remedial action was not effective is that the March 20, 2007, letter to Truhlicka informed him that if he failed to abide by the instructions, "or to retaliate against Ms. Grant in any way, (Truhlicka's) employment **will be terminated immediately**." Yet when Plaintiff complained that she was being retaliated against by being subjected to stares and whispers by Truhlicka, Shepard and other co-workers, Defendant did not fire Truhlicka, but instead issued written reminders to Truhlicka and Shepard that they had previously been told not to discuss the matter, again with the threat of immediate termination if they failed to abide or retaliate against Plaintiff. Thus, Defendant not only did not carry out the termination threatened in the original letter of admonishment, but there was virtually no punishment when the admonishment and investigation instructions to not discuss the matter were violated.

Defendant offers no evidence that any action was taken to monitor the work area or the individuals involved to make sure that the "Confidentiality Reminder" letters were obeyed. Reprimands without compliance assurance are meaningless and by no means effective remedial action. Plaintiff's personal journal, referenced as Exhibit 8 to her deposition reflects repeated instances of looking, staring, pointing and laughing directed at her and requests for help directed to Denker. According to the May 15, 2007 entry therein, Denker[']s advice was to "act like it didn't bother (Plaintiff)." This is in direct conflict with Denker[']s assertion in her affidavit, paragraph 12, that Plaintiff never complained again about co-workers discussing her harassment allegations, as claimed in Defendant's brief. This is **not** effective remedial action.

13

> No evidence has been adduced to show that training or counseling were given to Truhlicka, nor that he was transferred to another work area to separate him from Plaintiff, nor that he was suspended, with or without pay. He was only given what might be considered a written admonishment, and there was no apparent effort to see that he obeyed it. Witnesses are named in Plaintiff's journal, who, if given an opportunity to testify at trial, can corroborate that Truhlicka proceeded to create a hostile work place by conducting a campaign of hostility and derision toward Plaintiff among co-workers.[6]

(Plaintiff's brief, at 7-9 (emphasis in original).)

The Eighth Circuit, "like several other circuits, has adopted the EEOC's regulatory rule that '[w]ith respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer . . . knows or should have known of the conduct, unless it can show that it took immediate action and appropriate corrective action.'" *Engel*, 506 F.3d at 1123 (quoting 29 C.F.R. § 1604.11(d)). "Under this negligence standard, an employer is not liable if it takes prompt remedial action that is reasonably calculated to stop the harassment." *Id.* (citing *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir.1999)). "[R]emedial action that does not end the harassment can still be adequate if it is reasonably calculated to do so." *Id.*, at 1125. "The prevailing case law provides, however, that if the employer fails to take proper remedial action, then it may be culpable for harassment to which it did not adequately respond, on the theory that 'the combined knowledge and inaction may be seen as demonstrable negligence, or as the employer's adoption of the offending conduct and its results, quite as if they had been authorized affirmatively as the employer's policy.'" *Id.*, at 1123-24 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998)). "That an employer responds adequately to an initial report of sexual harassment . . . does not discharge

---

[6] Grant has not presented any evidence concerning prospective testimony of these witnesses.

14

the employer's responsibility to respond properly to subsequent reports of offending conduct by the harasser." *Id.*, at 1125 (concluding as a matter of law that employer was not liable for hostile work environment that existed prior to first remedial action, but finding genuine issues of material fact as to whether harassment continued and whether second remedial action was adequate). "The promptness and adequacy of an employer's response will often be a question of fact for the factfinder to resolve." *Carter*, 173 F.3d at 702.[7]

---

[7] However, the Eighth Circuit on several occasions has affirmed the granting of summary judgment in favor of an employer based on a determination as a matter of law that prompt and effective remedial action had been taken. *See, e.g., Anda*, 517 F.3d at 532 (because undisputed evidence showed that defendant dealt with plaintiff's specific complaints about coworker in prompt and effective manner, by issuing written reprimand and terminating his employment 2 weeks later, no material question of fact was raised regarding final element of plaintiff's prima facie case); *Engel*, 506 F.3d at 1125 (concluding as a matter of law that employer was not liable for hostile work environment that existed before it took remedial action by suspending harassing co-worker for 2 weeks, restricting his ability to gain access to buildings, assigning him to undergo counseling, and warning that additional harassment or inappropriate conduct would result in termination; response was prompt, reasonably comprehensive in scope, and stern in its warnings; although this action did not stop harassment entirely, it did eliminate some offending conduct; "[T]he law does not require an employer to fire a sexual harasser in the first instance to demonstrate an adequate remedial response."); *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 912 (8th Cir. 2006) (although defendant's supervisory employees may not have reacted in ideal manner, and waited one month before terminating harassing co-worker, remedial actions were sufficient as a matter of law); *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 851 (8th Cir. 2005) (defendant transferred male employee to another job site after receiving anonymous tip that he was harassing female employees; defendant later learned that transferred employee had been harassing plaintiff, but no further incidents were reported; plaintiff failed to make required showing that defendant knew or should have known of harassment and failed to take proper remedial action); *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 994 (8th Cir. 2003) (defendant's remedial actions were prompt and effective as a matter of law where harassing co-worker was suspended for 1 week,

15

Grant suggests that there should have been closer monitoring of Truhlicka's compliance with the written warning he was issued on March 20, 2007,[8] but it is

---

required to undergo training, and warned that he would be terminated if another incident occurred); *Rheineck*, 261 F.3d at 756 (where employer immediately confiscated revealing picture of woman who bore striking resemblance to plaintiff and later disciplined 9 employees and required them to take sexual harassment training, no reasonable juror could find remedial actions to be anything but prompt and reasonably designed to end harassment); *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 968 (8th Cir. 1999) (undisputed evidence showed that every time plaintiff complained to management, it responded to her satisfaction; moreover, after management took action, incidents of sexual harassment were not repeated; district court thus correctly determined that there was no genuine issue of material fact as to whether defendant promptly and adequately responded to plaintiff's complaints); *Brown v. City of St. Louis Public Safety Dept.*, 133 F.3d 921 (Table), 1997 WL 792460, at *1 (8th Cir. Dec. 30, 1997) (per curiam) (defendant, after receiving report from plaintiff that co-worker had on 3 occasions made unwelcome sexual comments to her, had once touched her inappropriately, and had blown kisses at her, immediately reprimanded co-worker and required him to apologize; 2 weeks later, after plaintiff reported being kissed by same co-worker, he was transferred to another shift, required to enter sexual harassment training program, and placed on 8-day suspension without pay; no further incidents of harassment occurred; held that district court properly concluded that defendant's response to harassment was sufficient as a matter of law). *See also Tatum v. Arkansas Dept. of Health*, 411 F.3d 955, 959-60 (8th Cir. 2005) (defendant's investigation into plaintiff's complaint of sexual harassment did not begin for 2 weeks and took 10 more weeks to complete, during which time plaintiff was required to work in same office as alleged harasser, although no further harassment was reported; alleged harasser was not disciplined because investigators "neither believed nor disbelieved" plaintiff and disregarded another woman's complaint because of lack of corroboration; held that defendant's remedial action, "though perhaps not model," satisfied required standard, and that defendant was entitled to judgment as a matter of law on hostile work environment claim).

[8] Truhlicka was "warned to stop any unwelcome sexual advances toward Ms. Grant or any other female employee, and to refrain from discussing anything of a sexual nature with female coworkers. You are not to proposition them, tell them dirty jokes, or repeatedly ask for dates." (Filing 25, at 37.) Truhlicka was also

16

undisputed that "[f]ollowing Grant's report on March 19, 2007, the inappropriate conduct about which Grant had complained never recurred" and that "[n]either Grant nor any other employee ever reported any further conduct by Truhlicka of a sexual or inappropriate nature."[9] (Defendant's statement of material facts, ¶ 31.) Grant was instructed to let Ben Hughes or John Hughes know if she had any further problems with Truhlicka, but the only additional complaint she made to either of them was on May 7, 2007, when she communicated her belief that Mick Shepard was talking with other employees about her harassment complaint. That report was again promptly investigated and was dealt with to Grant's satisfaction.

Grant also argues that Hughes Brothers should have made certain that Truhlicka and Shephard complied with the confidentiality reminders they received on May 9, 2007.[10] However, there is no real evidence of their noncompliance; Grant

---

warned that "[i]f you fail to abide by these instructions, or to [sic] retaliate against Ms. Grant in any way, your employment will be terminated immediately." (*Id.*)

[9] Grant complained that Truhlicka continually followed her, made lewd and suggestive comments, and brushed up against her when they worked together.

[10] Truhlicka's reminder stated, in part: "At the time of your meeting with Ben Hughes and John Hughes you were informed that you were not to discuss this claim with any other employees because of its confidential nature. On May 8, 2007 it was brought to our attention that you may have not abided by this request in that you may be discussing information regarding the claimant and case with other employees. If this is the case, this behavior needs to stop immediately and will no longer be tolerated. (Filing 25, at 30 (paragraph formatting omitted).) Similarly, Shephard's reminder stated, in part: "At the time of your interview with Ben Hughes and John Hughes you were informed that you were not to discuss the interview or this claim with any other employees because of its confidential nature. On May 8, 2007 it was brought to our attention that you have not abided by this request and had informed the claimant 'you were not under any gag orders.' This is an untrue statement. You were instructed not to discuss this matter. This behavior needs to stop immediately and will no longer be tolerated." (*Id.*, at 29 (paragraph formatting omitted).) Both men

17

simply suspected that other employees were staring and pointing at her because of something that Truhlicka or Shephard had said about her harassment complaint. In fact, Grant's journal entry for May 15, 2007, states: "Went to Chantel [Denker] again because [Truhlicka] and Mick [Shephard] are obviously still talking about me. They (and people in Boring, and Scott, Irvin) keep looking, pointing, staring, laughing, etc. at me– it's only obvious. She asked me if I actually heard them talking about me or if anyone else has told me they are still talking about me and I said no." (Filing 28, at 140.) Grant's journal entry for June 15, 2007, which was the only other time she complained to Hughes Brothers that Truhlicka and Shephard allegedly were violating the confidentiality reminders, similarly states: "I also told [Denker] about Mick, [Truhlicka], Scott, Irvin, etc., still talking about me. She again asked if I or anyone else actually heard them say something about me and I said no, they're just doing the same stuff– constantly talking, pointing, staring, laughing at me." (*Id.*, at 141.) Denker advised Grant that she could approach the other employees to try to resolve the matter on her own, but that she should also let Denker know if she needed any further assistance; she was also advised to document any further incidents. Grant admits that the staring and pointing incidents "died off" over time. (Defendant's statement of material facts, ¶30.) "After June 15, 2007, Grant never brought forth or communicated any additional concerns regarding harassment or confidentiality to Denker, Kotil, John Hughes, or anyone else in a management position at Hughes Brothers." (*Id.*, ¶29.)

Grant has presented no evidence that there was any apparent need for Hughes Brothers to suspend Truhlicka, to transfer him to a different work area, or to require him to attend training or counseling sessions. Nor has she presented any evidence that Hughes Brothers had any reason to fire Truhlicka or Shephard for failing to abide

---

were "warned to stop discussing this case with other employees because it is a confidential matter. If you fail to abide by these instructions, or to [sic] retaliate against the claimant in any way, your employment will be terminated immediately." (*Id.*, at 29-30.)

18

by the written warnings they received; to the contrary, it appears that the threat of immediate termination of their employment had the desired remedial effect.

> Generally, where the employer responds to a sexual harassment complaint in such a way as to promptly stop the sexual harassment, there is no basis for finding employer's postcomplaint actions not sufficiently corrective. *See Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1288 (11th Cir. 2003) ("[W]here the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow."); *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548, 1555 (11th Cir. 1997) ("Although [an employee] remains unsatisfied with [her employer's] resolution of her complaint, we have never stated . . . that a complainant in a discrimination action has a right to the remedy of her choice.").

*Weger v. City of Ladue*, 500 F.3d 710, 723 (8th Cir. 2007).

In summary, no reasonable jury could find that Hughes Brothers failed to take prompt and effective remedial action after Grant complained that she was being sexually harassed and subjected to a hostile work environment. Grant herself has admitted that Hughes Brothers responded appropriately to each of her reports, and it is undisputed that the offensive conduct she complained about stopped. Perhaps Hughes Brothers could have issued sterner warnings to Truhlicka and Shephard in the first instance not to discuss Grant's harassment complaint with other employees, but the confidentiality reminders they signed state that warnings were given during their meetings with Ben Hughes and John Hughes on March 19 and 20, 2007. Federal courts are not in the business of micromanaging or second-guessing companies' internal investigations of Title VII complaints. *See Adams v. O'Reilly Automotive, Inc.*, 538 F.3d 926, 930 (8th Cir. 2008).

Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment (filing 23) is granted. Judgment shall be entered by separate document dismissing the plaintiff's action with prejudice.

September 10, 2009.               BY THE COURT:

                *Richard G. Kopf*
                United States District Judge

---

\*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.